EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**
**PHOENIX**

KRUEGER INVESTMENTS, LLC, *et al.*,

Plaintiffs,

vs.

CARDINAL HEALTH 110, INC., *et al.*,

Defendants.

CASE NO. 2:12-CV-00618-JAT

JUDGE JAMES A. TEILBORG

## DECLARATION OF CHRISTOPHER FORST

I, Christopher Forst, hereby declare the following:

1.    I am more than 18 years of age and competent to make this declaration.

2.    I am a pharmacist in the Quality and Regulatory Affairs Section of Cardinal Health, Inc. ("Cardinal Health").  The facts in this declaration are based on my personal knowledge or upon information provided to me and maintained by Cardinal Health in the normal course of its business.

**A.    Cardinal Health's Anti-Diversion Obligation under Federal Law and as Interpreted by the United States Drug Enforcement Agency ("DEA").**

3.    Cardinal Health's Phoenix distribution center is registered with the DEA as a distributor of controlled substances.  As a DEA registrant, the Phoenix distribution center is obligated to obey the applicable provisions of the Controlled Substances Act ("CSA") and DEA regulations.

4.    Registration confers on wholesale distributors of controlled substances

1

like Cardinal Health a number of obligations under the CSA. Distributors of controlled substances must "maintain[ ] . . . effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(b)(1), (e)(1). To that end, wholesale distributors that supply pharmacies with controlled substances must "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Suspicious orders include "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." (Id.).

5.    In addition to reporting suspicious orders, the DEA has written a letter to pharmaceutical distributors stating that "a distributor has a statutory responsibility to exercise due diligence to *avoid* filling suspicious orders that *might be* diverted into other than legitimate medical, scientific, and industrial channels." Letter from Joseph T. Rannazzisi, DEA, to Cardinal Health (February 7, 2007), **Attachment 1** (emphasis added). Importantly, the DEA has stated that "a distributor may not simply rely on the fact that the person placing the suspicious order is a DEA registrant and turn a blind eye to the suspicious circumstances." *Id.*

6.    According to DEA's Diversion Investigator's Manual, "[a]n investigation will be conducted for possible violation of the CSA and regulations upon determining that the reporting registrant [such as Cardinal Health], as a general practice, does not voluntarily halt distributions of controlled substances to registrants involved in *suspected* diversion...." 96-2 Diversion Investigators

2

Manual, Section 5126, **Attachment 2** (emphasis added).

7.      Cardinal Health received another letter from the DEA regarding suspicious orders, emphasizing that "[t]he size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious."  Letter from Joseph T. Rannazzisi, Office of Diversion Control, DEA (December 27, 2007), **Attachment 3**.  Further, "[t]he determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the relevant segment of the regulated industry." *Id.*  DEA stated that failure to maintain effective controls against diversion may result in the revocation of a registrant's DEA registration.

   B.     **Cardinal Health's Inspection of Plaintiffs.**

8.      On or about December 14, 2011, Cardinal Health conducted a review of Eagle Pharmacy, LLC d/b/a Eagle Pharmacy #1.

9.      On or about January 4, 2012, Cardinal Health conducted a review of Krueger Investments, LLC d/b/a Eagle Pharmacy #2 ("Krueger Investments"). Cardinal Health's consultant and representatives spent hours asking Krueger Investments' principal, Brian Krueger, and Krueger Investments' staff questions and collecting data.  During a review of the information provided, Cardinal Health uncovered inconsistencies between Krueger Investments' representations to Cardinal Health and its purchase and sales records of controlled substances.

10.    In August 2009, Krueger Investments represented that 15% of its purchases were for controlled substances (Schedules II through V).  Krueger Investments' Response for SCS-P Retail Independent Pharmacy Questionnaire, p. 11, a true and accurate copy of which is attached as **Attachment 4.**  During Cardinal Health's January 4, 2012 review, Krueger Investments stated that 30% of its sales at that time came from controlled substances.  However, approximately 60% of Krueger Investments' purchases from Cardinal Health from June 1, 2011 through December 31, 2011 were for controlled substances.  These figures include Carisoprodol, which became a Schedule IV controlled substance in Arizona in 2003 and became a federally controlled substance in January 2012.  See **Attachment 5,** which is a true and accurate copy of a report maintained by Cardinal Health in the normal course of its business activity, and one I review as part of my job responsibilities.

11.    During Cardinal Health's January 2012 inspection, Krueger Investments' principal, Bryan Krueger, stated that Krueger Investments filled an average of approximately 85 prescriptions for controlled substances per day.  However, the top six prescribers for controlled substances alone prescribed an average of 245 prescriptions a day between October 1, 2011 and December 31, 2011.

12.    From October 1, 2011 to December 31, 2011, Krueger Investments purchased approximately 140,000 dosage units of oxycodone and approximately 216,000 dosage units of all Schedules II through V controlled substances during this period.  These purchases include Carisoprodol, which became a Schedule IV

4

controlled substance in Arizona in 2003 and became a federally controlled substance in January, 2012. See **Attachments 5-6**, which are true and accurate copies of reports maintained by Cardinal Health in the normal course of its business activity, and are reports I review as part of my job responsibilities.

13.   According to information provided by Krueger Investments, it dispensed 156,711 dosage units of oxycodone from October 1, 2011 to December 31, 2011. During this period, 106,099 dispensed dosage units of oxycodone were 30mg tablets, and 27,231 of the dosage units were for oxycodone 15mg tablets.

14.   The top two forms of oxycodone purchased by Krueger Investments from October 2011 to December 2011—the 30mg and 15mg products—pose a heightened risk of diversion because those products are the most susceptible to abuse. See **Attachment 7**, which is a true and accurate copy of a report maintained by Cardinal Health in the normal course of its business activity, and one that I review as part of my job responsibilities. Additionally, Krueger Investments' top hydrocodone product was a product containing 10 milligrams of hydrocodone, the highest strength hydrocodone tablet commercially available.

15.   One of Krueger Investments' top prescribers was a physician who was censured by the Arizona Board of Medicine in August 2009 for problems with his controlled substance prescribing, and who issued prescriptions from an office approximately 13 miles away from Krueger Investments.   Two other top prescribers for Krueger Investments issued prescriptions from offices approximately 19 and 22 miles away from Krueger Investments.

16.    As a result of Cardinal Health's January 2012 inspection of Krueger Investments, Cardinal Health determined that Krueger Investments' high-volume orders of controlled substances, particularly its purchases of oxycodone, in combination with inaccurate information provided by Krueger Investments about its volume and ratio of controlled substances purchases, and other indicia of diversion, created a suspicion that Krueger Investments might be diverting controlled substances.

17.    Applying DEA's interpretation of federal law, Cardinal Health ceased distribution of controlled substances to Plaintiff.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:
June ⁄⁄, 2012

_____
Christopher Forst

6

# EXHIBIT A
# Attachment 1

SEP-25-2007 TUE 01:22 PM CARDINAL HEALTH          FAX NO. 7404525580          P. 01



## U.S. DEPARTMENT OF JUSTICE

## DRUG ENFORCEMENT ADMINISTRATION

www.dea.gov

Washington, D.C. 20537

CARDINAL HEALTH
3540 EAST PIKE
ZANESVILLE, OH 43701-0000

February 7, 2007

ＩｕＩｕＩｕＩｕＩＩｕＩＩＩｕＩＩＩＩｕＩＩＩＩｕＩＩＩＩＩｕＩＩＩＩＩｕＩＩＩｕＩＩＩＩＩ

In reference to registration
# RN0209583

Dear Sir or Madam:

This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Administration (DEA) to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces.

### Background

As each of you is undoubtedly aware, the abuse (nonmedical use) of controlled prescription drugs is a serious and growing health problem in this country.[1] DEA has an obligation to combat this problem as one of the agency's core functions is to prevent the diversion of controlled substances into illicit channels. Congress assigned DEA to carry out this function through enforcement of the Controlled Substances Act (CSA) and DEA regulations that implement the Act.

The CSA was designed by Congress to combat diversion by providing for a closed system of drug distribution, in which all legitimate handlers of controlled substances must obtain a DEA registration and, as a condition of maintaining such registration, must take reasonable steps to ensure that their registration is not being utilized as a source of diversion. Distributors are, of course, one of the key components of the distribution chain. If the closed system is to function properly as Congress envisioned, distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.[2]

### The Statutory Scheme and Legal Duties of Distributors as DEA Registrants

Although most distributors are already well aware of the following legal principles, they are reiterated here as additional background for this discussion.

The CSA uses the concept of registration as the primary means by which manufacturers, distributors, and practitioners are given legal authority to handle controlled substances. Registration also serves as the primary incentive for compliance with the regulatory requirements of the CSA and DEA regulations, as Congress gave DEA authority under the Act to revoke and suspend registrations for failure to comply with these requirements. (Depending on the circumstances, failure to comply with the regulatory requirements might also provide the basis for criminal or civil action under the CSA.)

---

[1] See National Institute on Drug Abuse Research Report: Prescription Drug Abuse and Addiction (revised August 2005); available at www.drugabuse.gov/PDF/RRPrescription.pdf

[2] 21 U.S.C. 801(2)

Page 2

Before taking an action to revoke a registration, DEA must serve the registrant an order to show cause, which advises the registrant of its right to an administrative hearing before the agency (21 U.S.C 824(c)). The CSA also gives DEA discretionary authority to suspend any registration simultaneously with the initiation of revocation proceedings in cases where the agency finds there is an imminent danger to the public health and safety (21 U.S.C. 824(d)).

DEA recognizes that the overwhelming majority of registered distributors act lawfully and take appropriate measures to prevent diversion. Moreover, all registrants - manufacturers, distributors, pharmacies, and practitioners - share responsibility for maintaining appropriate safeguards against diversion. Nonetheless, given the extent of prescription drug abuse in the United States, along with the dangerous and potentially lethal consequences of such abuse, even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm. Accordingly, DEA will use its authority to revoke and suspend registrations in appropriate cases.

The statutory factors DEA must consider in deciding whether to revoke a distributor's registration are set forth in 21 U.S.C. 823(e). Listed first among these factors is the duty of distributors to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific, and industrial channels. In addition, distributors must comply with applicable state and local law. Congress also gave DEA authority under this provision to revoke a registration based on the distributor's past experience in the distribution of controlled substances and based on "such other factors as may be relevant to and consistent with the public health and safety."

The DEA regulations require all distributors to report suspicious orders of controlled substances. Specifically, the regulations state in 21 C.F.R. 1301.74(b):

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

It bears emphasis that the foregoing reporting requirement is in addition to, and not in lieu of, the general requirement under 21 U.S.C. 823(e) that a distributor maintain effective controls against diversion.

Thus, in addition to reporting all suspicious orders, a distributor has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels. Failure to exercise such due diligence could, as circumstances warrant, provide a statutory basis for revocation or suspension of a distributor's registration.

In a similar vein, given the requirement under section 823(e) that a distributor maintain effective controls against diversion, a distributor may not simply rely on the fact that the person placing the suspicious order is a DEA registrant and turn a blind eye to the suspicious circumstances. Again, to maintain effective controls against diversion as section 823(e) requires, the distributor should exercise due care in confirming the legitimacy of all orders prior to filling.

In addition, distributors are required to file reports of distributions of certain controlled substances to the DEA ARCOS Unit, in the time and manner specified in the regulations (21 C.F.R. 1304.33). The failure to file ARCOS reports in a complete and timely manner is a potential statutory basis for revocation under section 823(e). Depending on the circumstances, the failure to keep or furnish required records might also be the basis for civil fines or criminal penalties under the CSA, as provided in 21 U.S.C. 842.

Page 3

## Circumstances That Might Be Indicative of Diversion

DEA investigations have revealed that certain pharmacies engaged in dispensing controlled substances for other than a legitimate medical purpose often display one or more of the following characteristics in their pattern of ordering controlled substances:

1. Ordering excessive quantities of a limited variety of controlled substances (e.g. , ordering only phentermine, hydrocodone, and alprazolam) while ordering few, if any, other drugs

2. Ordering a limited variety of controlled substances in quantities disproportionate to the quantity of non-controlled medications ordered

3. Ordering excessive quantities of a limited variety of controlled substances in combination with excessive quantities of lifestyle drugs

4. Ordering the same controlled substance from multiple distributors

A distributor seeking to determine whether a suspicious order is indicative of diversion of controlled substances to other than legitimate medical channels may wish to inquire with the ordering pharmacy about the following:

1. What percentage of the pharmacy's business does dispensing controlled substances constitute?

2. Is the pharmacy complying with the laws of every state in which it is dispensing controlled substances?

3. Is the pharmacy soliciting buyers of controlled substances via the Internet or is the pharmacy associated with an Internet site that solicits orders for controlled substances?

4. Does the pharmacy, or Internet site affiliated with the pharmacy, offer to facilitate the acquisition of a prescription for a controlled substance from a practitioner with whom the buyer has no pre-existing relationship?

5. Does the pharmacy fill prescriptions issued by practitioners based solely on an on-line questionnaire without a medical examination or bona-fide doctor-patient relationship?

6. Are the prescribing practitioners licensed to practice medicine in the jurisdictions to which the controlled substances are being shipped, if such a license is required by state law?

7. Are one or more practitioners writing a disproportionate share of the prescriptions for controlled substances being filled by the pharmacy?

8. Does the pharmacy offer to sell controlled substances without a prescription?

9. Does the pharmacy charge reasonable prices for controlled substances?

10. Does the pharmacy accept insurance payment for purchases of controlled substances made via the Internet?

These questions are not all-inclusive; nor will the answer to any of these questions necessarily determine whether a suspicious order is indicative of diversion to other than legitimate medical channels. Distributors should consider the totality of the circumstances when evaluating an order for controlled substances, just as DEA will do when determining whether the filling of an order is consistent with the public interest within the meaning of 21 U.S.C. 823(e).

SEP-25-2007 TUE 01:23 PM CARDINAL HEALTH          FAX NO. 7404525580          P. 04

Page 4

We look forward to continuing to work in cooperation with distributors toward our mutual goal of preventing the diversion of pharmaceutical controlled substances.

Sincerely,

Joseph T. Rannazzisi
Deputy Assistant Administrator
Office of Diversion Control

# EXHIBIT A
# Attachment 2


U.S. Department of Justice
Drug Enforcement Administration





# Diversion
# Investigators
# Manual

DEA SENSITIVE
This manual is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

5124.9

The FBI is responsible for actions under this Section. If DEA receives information (e.g., telephonic, DEA-106) of a registrant theft which appears to meet the above criteria, DEA shall immediately notify the FBI office having jurisdiction. Additionally, the registrant will be reminded to immediately contact and inform the local police agency of the theft. DO NOT send a copy of all DEA-106's to the FBI, only those which appear to meet one or more of the above criteria.

If the theft meets one of the criteria listed above, DEA will provide to the FBI, on request, case files regarding security at the firm, which may include past thefts or information on suspected violations.

## 5125 COMPLIMENTARY SAMPLES

It is the policy of DEA to encourage drug manufacturers not to distribute controlled substance samples through detailmen, but to substitute other, safer methods of promoting their products. These methods could include sending samples to physicians directly and not through detailmen, and to institute complimentary prescriptions.

Order forms are required for samples of such substances listed in Schedule II.

The written requests will be preserved by the registrant with his or her distribution records. The request will contain the name, address and registration number of the customer and the name and quantity of the controlled substances.

## 5126 REQUIREMENT TO REPORT SUSPICIOUS ORDERS

Registrants are required to inform DEA of suspicious orders in accordance with 21 CFR 1301.74(b). DEA field offices are not to approve or disapprove supplier shipments of controlled substances. The responsibility for making the decision to ship rests with the supplier. An exception to this occurs when a supplier complies with a DEA field office's request to initiate a controlled delivery of controlled substances.

DEA field offices will provide the supplier with the related registration information (i.e., whether the customer is currently registered with DEA) needed to assist the supplier in making an independent decision on whether to ship controlled substances.

Registrants, who routinely report suspicious orders, yet fill these orders, with reason to believe they are destined for the illicit market, are expressing an attitude of irresponsibility

DEA SENSITIVE

DEA SENSITIVE
This manual is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

5126

that is a detriment to the public health and safety as set forth
in 21 U.S.C. 823 and 824. Suspicious orders include those which
are in excess of legitimate medical use or exhibit
characteristics leading to possible diversion such as: orders of
unusual size, unusual frequency, or those deviating substantially
from a normal pattern. The supplier can determine whether the
order is excessive by checking their own sales and establishing
the average amount of controlled substances shipped to
registrants of the same apparent size in a particular geographic
area. If the customer exceeds this threshold, the request should
be viewed as suspicious. This activity, over extended periods of
time, would lead a reasonable person to believe that controlled
substances possibly are being diverted. An investigation will be
conducted for possible violation of the CSA and regulations upon
determining that the reporting registrant, as a general practice,
does not voluntarily halt shipments of controlled substances to
registrants involved in suspected diversion or to registrants
against whom previous action has been taken. In these instances,
the registrant is subject to the appropriate prosecution and/or
administrative action.

# EXHIBIT A
# Attachment 3



# U.S. DEPARTMENT OF JUSTICE

# DRUG ENFORCEMENT ADMINISTRATION

www.dea.gov                                                          Washington, D.C. 20537

CARDINAL HEALTH                                             December 27, 2007
6012 MOLLOY RD
SYRACUSE NY,  13211-0000

ͬ.ͷ.ͷͷ.ͷͷ.ͷͷͷͷͷ.ͷͷͷͷ.ͷͷͷͷͷ.ͷͷ                              In reference to registration
                                                               # PC0003044
Dear Registrant:

This letter is being sent to every entity in the United States registered with the Drug
Enforcement Administration (DEA) to manufacture or distribute controlled substances.  The purpose
of this letter is to reiterate the responsibilities of controlled substance manufacturers and distributors
to inform DEA of suspicious orders in accordance with 21 CFR 1301.74(b).

In addition to, and not in lieu of, the general requirement under 21 USC 823, that
manufacturers and distributors maintain effective controls against diversion, DEA regulations require
all manufacturers and distributors to report suspicious orders of controlled substances.  Title 21 CFR
1301.74(b), specifically requires that a registrant "design and operate a system to disclose to the
registrant suspicious orders of controlled substances."  The regulation clearly indicates that it is the
sole responsibility of the registrant to design and operate such a system.  Accordingly, DEA does not
approve or otherwise endorse any specific system for reporting suspicious orders.  Past
communications with DEA, whether implicit or explicit, that could be construed as approval of a
particular system for reporting suspicious orders, should no longer be taken to mean that DEA
approves a specific system.

The regulation also requires that the registrant inform the local DEA Division Office of
suspicious orders <u>when discovered</u> by the registrant.  Filing a monthly report of completed
transactions (e.g., "excessive purchase report" or "high unit purchases") does not meet the regulatory
requirement to report suspicious orders.  Registrants are reminded that their responsibility does not
end merely with the filing of a suspicious order report.  Registrants must conduct an independent
analysis of suspicious orders prior to completing a sale to determine whether the controlled
substances are likely to be diverted from legitimate channels.  Reporting an order as suspicious will
not absolve the registrant of responsibility if the registrant knew, or should have known, that the
controlled substances were being diverted.

The regulation specifically states that suspicious orders include orders of an unusual size,
orders deviating substantially from a normal pattern, and orders of an unusual frequency.  These
criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a
normal pattern, the size of the order does not matter and the order should be reported as suspicious.
Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining
whether a particular order is suspicious.  The size of an order alone, whether or not it deviates from a
normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious.
The determination of whether an order is suspicious depends not only on the ordering patterns of the
particular customer, but also on the patterns of the registrant's customer base and the patterns
throughout the relevant segment of the regulated industry.

Page 2

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communications with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by a registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.

For additional information regarding your obligation to report suspicious orders pursuant to 21 CFR 1301.74(b), I refer you to the recent final order issued by the Deputy Administrator, DEA, in the matter of Southwood Pharmaceuticals Inc., 72 FR 36487 (2007). In addition to discussing the obligation to report suspicious orders when discovered by the registrant, and some criteria to use when determining whether an order is suspicious, the final order also specifically discusses your obligation to maintain effective controls against the diversion of controlled substances.

Sincerely,

Joseph T. Rannazzisi
Deputy Assistant Administrator
Office of Diversion Control

# EXHIBIT A
# Attachment 4

## Howenstein, Kim

| | |
|---|---|
| **From:** | Morse, Sherry |
| **Sent:** | Friday, August 28, 2009 2:23 PM |
| **To:** | GMB-QRA-Anti-Diversion |
| **Subject:** | Response for SCS-P Retail Independent Pharmacy Questionnaire |

E-mail notification for survey response
Survey Title: SCS-P Retail Independent Pharmacy Questionnaire Respondent Unique Key:
INQ-20090828125853-1472739198 Response Date: Fri, Aug 28, 2009 13:22:56

Page 1

    1. Are you a current or new customer?
    {Choose one}
    ( ) Current
    (*) New

    2. Visited by:
    {Enter text answer}
    [ Genevieve Johnson ]

    Date visited:
    {Enter text answer}
    [ 8/28/2009 ]

    Name/Title of person providing information:
    {Enter text answer}
    [ Bryan Krueger ]

    3. Pharmacy Legal Business Name:
    {Enter text answer}
    [ Krueger investments, LLC ]

    4. DEA Registration # of pharmacy:
    {Enter text answer}
    [ fp1538113 ]

    5. DBA (if any):
    {Enter text answer}
    [ Paradise Valley ]

    Address:
    {Enter text answer}
    [ 3805 E Bell Rd; ste 1900 ]

    City:
    {Enter text answer}
    [ Phoenix ]

    State:
    {Choose one}
    ( ) AK
    ( ) AL
    ( ) AR
    (*) AZ
    ( ) CA
    ( ) CO
    ( ) CT
    ( ) DC
    ( ) DE
    ( ) FL
    ( ) GA

```
( ) HI
( ) IA
( ) ID
( ) IL
( ) IN
( ) KS
( ) KY
( ) LA
( ) MA
( ) MD
( ) ME
( ) MI
( ) MN
( ) MO
( ) MS
( ) MT
( ) NC
( ) ND
( ) NE
( ) NH
( ) NJ
( ) NM
( ) NV
( ) NY
( ) OH
( ) OK
( ) OR
( ) PA
( ) RI
( ) SC
( ) SD
( ) TN
( ) TX
( ) UT
( ) VA
( ) VT
( ) WA
( ) WI
( ) WV
( ) WY
```

Zip:
{Enter text answer}
[ 85032 ]

Phone number(s):
{Enter text answer}
[ 602-404-5944 ]

Email:
{Enter text answer}
[ czervik@me.com ]

6. Has the pharmacy ever operated under a different name?
{Choose one}
( ) Yes
(*) No

Page 2

7. Board of Pharmacy License #:
{Enter text answer}
[ y005161 ]

Expiration date:
{Enter text answer}
[ 10/31/2009 ]

8. State Controlled Substance License #:
{Enter text answer}
[ n/a ]

Expiration date:
{Enter text answer}
[ n/a ]

10. Name of Pharmacist in charge:
{Enter text answer}
[ Bryan Krueger ]

State License #:
{Enter text answer}
[ s0012377 ]

11. How many other pharmacist(s) are currently practicing at this pharmacy?
{Choose one}
(*) None
( ) 1-2
( ) 3-4
( ) 5-6

9. Is your pharmacy located within 25 miles of a border state?
{Choose one}
( ) Yes
(*) No

Page 3

12. How many licensed or registered pharmacy staff members practice at this
pharmacy?
{Choose one}
(*) None
( ) 1-2
( ) 3-4
( ) 5-6

Page 4

1. Ownership type:
{Choose one}
( ) Sole proprietor
( ) Corporation
( ) Partnership
(*) Other [ LLC ]

Please indicate state of incorporation:
{Enter text answer}
[ AZ ]

2. Owner(s) Name(s):
{Enter text answer}
[ Kruegar Investments, LLC ]

3. DBA (if any):
{Enter text answer}
[ Paradise Valley Pharmacy ]

Owner Business Address:
{Enter text answer}
[ 3805 E Bell Rd; ste 1900 ]

Owner Phone:
{Enter text answer}
[ 602-404-5944 ]

3

```
City:
{Enter text answer}
[ phoenix ]

State:
{Choose one}
( ) AK
( ) AL
( ) AR
(*) AZ
( ) CA
( ) CO
( ) CT
( ) DC
( ) DE
( ) FL
( ) GA
( ) HI
( ) IA
( ) ID
( ) IL
( ) IN
( ) KS
( ) KY
( ) LA
( ) MA
( ) MD
( ) ME
( ) MI
( ) MN
( ) MO
( ) MS
( ) MT
( ) NC
( ) ND
( ) NE
( ) NH
( ) NJ
( ) NM
( ) NV
( ) NY
( ) OH
( ) OK
( ) OR
( ) PA
( ) RI
( ) SC
( ) SD
( ) TN
( ) TX
( ) UT
( ) VA
( ) VT
( ) WA
( ) WI
( ) WV
( ) WY

Zip:
{Enter text answer}
[ 85032 ]

4. Number of years owner has operated pharmacy:
{Enter text answer}
[ 0 ]
```

4

5. Is owner a licensed pharmacist?
{Choose one}
(*) Yes
( ) No

List State(s) and coordinating license number(s):
{Enter text answer}
[ s0012377 ]

6. Does owner operate/own any other pharmacies?
{Choose one}
( ) Yes
(*) No

Page 5

1. Has the pharmacy ever had a DEA registration suspended or revoked?
{Choose one}
( ) Yes
(*) No

2. Has the owner ever had a DEA registration suspended or revoked?
{Choose one}
( ) Yes
(*) No

Are there currently any suits, liens or judgments filed against owner(s) of
pharmacy?
{Choose one}
( ) Yes
(*) No

3. Has the pharmacy ever had a past and/or current state license(s)
suspended, revoked or disciplined?
{Choose one}
( ) Yes
(*) No

4. Has the pharmacy ever had a past and/or current state controlled
substance license suspended, revoked or disciplined?
{Choose one}
( ) Yes
(*) No

5. Has the Pharmacist-in-Charge ever had their state license(s) suspended,
revoked or disciplined?
{Choose one}
( ) Yes
(*) No

Page 6

6. Has the Pharmacist/owner (if applicable) had their state license(s)
suspended, revoked or disciplined?
{Choose one}
( ) Yes
(*) No

7. Please provide a list of names of all pharmaceutical distributors this
pharmacy used within the last 24 months:
{Enter answer in paragraph form}
[ n/a ]

8. Please provide a list of names of all pharmaceutical distributors this
pharmacy intends to continue to use:
{Enter answer in paragraph form}
[ Cardinal, Anda ]

5

9. Is pharmacy or owner a member of any professional associations (NCPA, APhA, etc.)?
{Choose one}
( ) Yes
(*) No

10. Does the pharmacy have any certifications (JCAHO, VIPPS, etc.)?
{Choose one}
( ) Yes
(*) No

Page 7

1. How does the pharmacy receive prescriptions? (check all that apply)
{Choose all that apply}
( ) Internet (new prescriptions)
( ) Internet (refills only)
(*) Electronic prescribing
(*) Fax
( ) Mail Order
(*) Phone
(*) Walk in

Internet (new prescriptions)
{Enter text answer}
[ 0 ]

Internet (refills only)
{Enter text answer}
[ 0 ]

Electronic prescribing
{Enter text answer}
[ 20 ]

Fax
{Enter text answer}
[ 20 ]

Mail Order
{Enter text answer}
[ 0 ]

Phone
{Enter text answer}
[ 20 ]

Walk in
{Enter text answer}
[ 40 ]

3. Is pharmacy licensed by states into which it dispenses?
{Choose one}
(*) Yes
( ) No

A. State:
{Choose one}
( ) AK
( ) AL
( ) AR
(*) AZ
( ) CA
( ) CO
( ) CT
( ) DC

6

```
( )  DE
( )  FL
( )  GA
( )  HI
( )  IA
( )  ID
( )  IL
( )  IN
( )  KS
( )  KY
( )  LA
( )  MA
( )  MD
( )  ME
( )  MI
( )  MN
( )  MO
( )  MS
( )  MT
( )  NC
( )  ND
( )  NE
( )  NH
( )  NJ
( )  NM
( )  NV
( )  NY
( )  OH
( )  OK
( )  OR
( )  PA
( )  RI
( )  SC
( )  SD
( )  TN
( )  TX
( )  UT
( )  VA
( )  VT
( )  WA
( )  WI
( )  WV
( )  WY

Pharmacy License #:
{Enter text answer}
[ y005161 ]

B. State:
{Choose one}
( )  AK
( )  AL
( )  AR
( )  AZ
( )  CA
( )  CO
( )  CT
( )  DC
( )  DE
( )  FL
( )  GA
( )  HI
( )  IA
( )  ID
( )  IL
( )  IN
( )  KS
```

```
( ) KY
( ) LA
( ) MA
( ) MD
( ) ME
( ) MI
( ) MN
( ) MO
( ) MS
( ) MT
( ) NC
( ) ND
( ) NE
( ) NH
( ) NJ
( ) NM
( ) NV
( ) NY
( ) OH
( ) OK
( ) OR
( ) PA
( ) RI
( ) SC
( ) SD
( ) TN
( ) TX
( ) UT
( ) VA
( ) VT
( ) WA
( ) WI
( ) WV
( ) WY
```

Pharmacy License #:
{Enter text answer}
[ ]

C. State:
{Choose one}
```
( ) AK
( ) AL
( ) AR
( ) AZ
( ) CA
( ) CO
( ) CT
( ) DC
( ) DE
( ) FL
( ) GA
( ) HI
( ) IA
( ) ID
( ) IL
( ) IN
( ) KS
( ) KY
( ) LA
( ) MA
( ) MD
( ) ME
( ) MI
( ) MN
( ) MO
( ) MS
```

```
( ) MT
( ) NC
( ) ND
( ) NE
( ) NH
( ) NJ
( ) NM
( ) NV
( ) NY
( ) OH
( ) OK
( ) OR
( ) PA
( ) RI
( ) SC
( ) SD
( ) TN
( ) TX
( ) UT
( ) VA
( ) VT
( ) WA
( ) WI
( ) WV
( ) WY
```

Pharmacy License #:
{Enter text answer}
[ ]

Page 8

4. Does pharmacy fill controlled substance prescriptions for patients that
reside out of state?
{Choose one}
( ) Yes
(*) No

5. Does pharmacy routinely fill controlled substance prescriptions written
by prescribers in other states?
{Choose one}
( ) Yes
(*) No

6. Hours of operation of the pharmacy:
{Enter text answer}
[ m-f 8-6 s 8-12 ]

7. Is the pharmacy affiliated with any internet websites?
{Choose one}
( ) Yes
(*) No

1

    Name
    {Enter text answer}
    [ ]

    Address or URL Address
    {Enter text answer}
    [ ]

2

    Name

{Enter text answer}
[ ]


Address or URL Address
{Enter text answer}
[ ]

3

Name
{Enter text answer}
[ ]


Address or URL Address
{Enter text answer}
[ ]

Page 9

8. Does your organization receive prescriptions from a website not owned by
your organization?
{Choose one}
( ) Yes
(*) No

9. Does your organization fill new prescriptions or sell pharmaceuticals
via the internet?
{Choose one}
( ) Yes
(*) No

10. Does your pharmacy fill prescriptions for controlled substances for
customers of websites that sell or offer to sell controlled substances or
prescriptions for controlled substances? The prescription might be
delivered to you either by referral from an Internet website; or at the
request of the owner, operator or employee of such a website; or by
referral from a practitioner affiliated with such a website.
{Choose one}
( ) Yes
(*) No

Page 10

11. Do you, or does your pharmacy, advertise on the Internet or send
unsolicited email(s) with offer(s) to sell a controlled substance or a
prescription for a controlled substance?
{Choose one}
( ) Yes
(*) No

12. Do you, or does your pharmacy, advertise on the Internet or send
unsolicited email(s) that direct persons to a website through which a
controlled substance or a prescription for a controlled substance may be
purchased?
{Choose one}
( ) Yes
(*) No

13. How does pharmacy receive payment for prescriptions and in what
approximate percentage?
{Choose all that apply}
(*) Private Insurance
(*) 3rd Party (Medicare/Medicaid)
(*) Worker's Compensation
(*) Cash

10

( ) Other [ ]

PI % of Revenue
{Enter text answer}
[ 90 ]

3P % of Revenue
{Enter text answer}
[ 3 ]

WC % of Revenue
{Enter text answer}
[ 2 ]

Csh % of Revenue
{Enter text answer}
[ 5 ]

Othr % of Revenue
{Enter text answer}
[ 0 ]

Page 11

14. Does the pharmacy service any of the following? (check all that apply)
{Choose all that apply}
( ) Hospice
( ) Long Term Care facilities
( ) Nursing Home
(*) None of the above

15. Do you service pain managment clinics?
{Choose one}
( ) Yes
(*) No

16. Please describe front-end merchandise at your pharmacy (e.g., durable
medical equipment, home healthcare aids, vitamins, cosmetics, etc.):
{Enter answer in paragraph form}
[ Small front end with assortment of products. ]

Page 12

1. What products does the pharmacy expect to purchase from Cardinal Health
and in what percent of total order? (check all that apply)
{Choose all that apply}
(*) OTC
(*) Prescription
(*) Controlled Substances
(*) Listed Chemicals
(*) Other [ ]

OTC % of total purchases
{Enter text answer}
[ 5 ]

Pscrp % of total purchases
{Enter text answer}
[ 80 ]

CS % of total purchases
{Enter text answer}
[ 15 ]

LC % of total purchases
{Enter text answer}
[ 0 ]

Othr % of total purchases
{Enter text answer}
[ 0 ]

2. What products does the pharmacy expect to purchase from other
distributors and in what percent of total order? (check all that apply)
{Choose all that apply}
(*) OTC
(*) Prescription
(*) Controlled Substances
(*) Listed Chemicals
(*) Other [ ]

OTC % of total purchases
{Enter text answer}
[ 0 ]

Pscrp % of total purchases
{Enter text answer}
[ 100 ]

CS % of total purchases
{Enter text answer}
[ 0 ]

LC % of total purchases
{Enter text answer}
[ 0 ]

Othr % of total purchases
{Enter text answer}
[ 0 ]

Phentermine
{Enter text answer}
[ 200 ]

Hydrocodone
{Enter text answer}
[ 1000 ]

Alprazolam
{Enter text answer}
[ 1000 ]

Oxycodone
{Enter text answer}
[ 1000 ]

Provide sales for last 12 months:
{Enter text answer}.
[ $0 ]

Page 13

1. Is the pharmacy located within a medical center?
{Choose one}
(*) Yes
( ) No

2. Are there hospitals, doctors' offices or medical clinics in the vicinity
(5 miles) of the pharmacy?
{Choose one}
(*) Yes
( ) No

Please identify name, address, city, state, zip and proximity to pharmacy:
{Enter answer in paragraph form}
[ Paradise Valley Hospital Phoenix, AZ 85032 ]

Any additional comments? (If a threshold event has not occurred please enter N/A)
{Enter answer in paragraph form}
[ n/a ]

Name:
{Enter text answer}
[ Bryan Krueger ]

Company:
{Enter text answer}
[ Paradise Valley ]

Title:
{Enter text answer}
[ Owner ]

Are you filling this questionnaire out as a result of a regulatory hold on order?
{Choose one}
( ) Yes
(*) No

EXHIBIT A
Attachment 5



**Paradise Valley Pharmacy**
DEA registration number FP1538113

Purchase Ratio - Schedule II-V Vs. Non-Controlled
June 1, 2011 - December 31, 2011

Percent Schedule II-V Vs. Non-Controlled
June 1, 2011 - December 31, 2011

Category
Non-Controlled Substances
Schedule II-V Controlled Substances (Including Carisoprodol)

# EXHIBIT A
# Attachment 6

| DEA Number | Name | Address | City | State | Zip | Month | Oxycodone Dosage Quantity |
|---|---|---|---|---|---|---|---|
| FP1538113 | PARADISE VALLEY PHARMACY | 3805 E BELL ROAD | PHOENIX | AZ | 85032 | 6/1/2011 | 41,600 |
| FP1538113 | PARADISE VALLEY PHARMACY | 3805 E BELL ROAD | PHOENIX | AZ | 85032 | 7/1/2011 | 42,200 |
| FP1538113 | PARADISE VALLEY PHARMACY | 3805 E BELL ROAD | PHOENIX | AZ | 85032 | 8/1/2011 | 42,800 |
| FP1538113 | PARADISE VALLEY PHARMACY | 3805 E BELL ROAD | PHOENIX | AZ | 85032 | 9/1/2011 | 45,800 |
| FP1538113 | PARADISE VALLEY PHARMACY | 3805 E BELL ROAD | PHOENIX | AZ | 85032 | 10/1/2011 | 44,700 |
| FP1538113 | PARADISE VALLEY PHARMACY | 3805 E BELL ROAD | PHOENIX | AZ | 85032 | 11/1/2011 | 42,000 |
| FP1538113 | PARADISE VALLEY PHARMACY | 3805 E BELL ROAD | PHOENIX | AZ | 85032 | 12/1/2011 | 52,800 |

# EXHIBIT A
# Attachment 7

## Monthly Drug Family Distribution by Strength



Sum of Dosage Unit Qty for each Invoice Date Month broken down by Drug Family Name and Invoice Date Year.  Color shows details about Strength. The data is filtered on Base Code, Action (DEA Number,Name), Action (Base Code), Action (Business Unit,Product Category) and Invoice Date. The Base Code filter keeps multiple members. The Action (DEA Number,Name) filter specifies a set. The Action (Base Code) filter specifies a set. The Action (Business Unit,Product Category) filter specifies a set. The Invoice Date filter ranges from 10/1/2011 to 12/31/2011.